[Cite as *State v. Deaver*, 2026-Ohio-2539.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | |
| | | No. 115452 |
| v. | : | |
| JUWONE DEAVER, | : | |
| Defendant-Appellant. | : | |

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** July 2, 2026

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-24-694514-A

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Eben O. McNair, Assistant Prosecuting Attorney, *for appellee.*

Susan J. Moran and Michael T. Fisher, *for appellant.*

EILEEN T. GALLAGHER, P.J.:

{¶ 1} Appellant Juwone Deaver ("Deaver") challenges his convictions and sentences for charges of murder, felonious assault, improperly discharging a firearm, and accompanying firearm specifications. He raises five assignments of error:

1. Defendant's rights under the Fifth and Fourteenth Amendments to the United States Constitution, as well as Article 1, Sections 10 and 16 of the Ohio Constitution, were violated because the trial court allowed the State to use the defendant's pre-arrest silence as evidence of guilt.

2. The trial court abused its discretion and violated Defendant's right to Due Process under the Fourteenth Amendment to the United States Constitution, as well as Article 1, Section 16 of the Ohio Constitution, when the trial [court] failed to issue the appropriate jury instructions.

3. Defendant's convictions were not based on sufficient evidence and the trial court violated appellant's right to Due Process pursuant to Article 1, Section 16 of the Ohio Constitution and the Fifth and Fourteenth Amendments to the U.S. Constitution, when the court denied Defendant's motions for acquittal pursuant to Crim.R. 29.

4. The trial court violated Defendant's right to Due Process pursuant to Article 1, Section 16 of the Ohio Constitution and the Fifth and Fourteenth Amendments to the U.S. Constitution, when the court arbitrarily limited defendant's ability to present evidence and cross-examine his accusers.

5. The trial court violated the Defendant's rights under the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution, and Article 1, Sections 9 and 16 of the Ohio Constitution, when the trial court imposed a consecutive sentence which is not clearly and convincingly supported by the record.

{¶ 2} After a thorough review of the applicable law and facts, we find that the trial court did not err in allowing or precluding certain questions and testimony at trial. The court also did not err in declining to provide jury instructions that were unwarranted based upon the facts of the case. We further find that Deaver's convictions were supported by sufficient evidence and Deaver failed to demonstrate that the record clearly and convincingly did not support the imposition of consecutive sentences.

{¶ 3} We overrule the assignments of error and affirm the judgment of the trial court.

## I. Factual and Procedural History

{¶ 4} This matter arises from a shooting that occurred on the Fourth of July in 2024. On this day, Deaver, his half-brother Jemerious Davis ("Davis"), and other family and friends had gathered at a residence on West 125th Street for a cookout. Among the over 20 guests at the cookout were Deaver's then-girlfriend, T.C., and her ten-year-old daughter, G.G.

{¶ 5} At one point during the gathering, a dark-colored Dodge Durango ("Durango") with heavily tinted windows drove by the house slowly; it later turned around and drove past the house again at the same slow speed. Deaver yelled for everyone to get inside the house. He and Davis claimed that the occupants of the Durango began shooting, so they returned fire, striking the Durango, a window in the house across the street, and two other vehicles. None of the occupants of the Durango were shot.

{¶ 6} During the melee, G.G. was running up the steps to the house when she was struck in the head by a bullet. She fell onto the porch and was bleeding profusely. T.C. called 911 while Deaver put G.G. in his father's vehicle to take her to the hospital. Cleveland Police officers arrived on scene just then, placed G.G. in the rear of their patrol car, and took her, T.C., and two other family members to the hospital.

{¶ 7} Davis, Deaver, and other friends and family also went to the hospital. G.G. tragically died from her injuries.

{¶ 8} At the hospital, police took statements from the family members, and Cleveland Police homicide detective Jonathan Dayton ("Det. Dayton") interviewed both Davis and Deaver separately. Neither one informed the detective that they had shot at the Durango. Deaver told the police that he did not know who at the house had shot at the vehicle. However, the next day, Deaver told another family member, M.M., that he had shot at the Durango to protect his family. Deaver was arrested several weeks after the shooting occurred.

{¶ 9} An analyst from the Cleveland Police Department's Real Time Crime Center assisted police in locating the Durango after it had left the scene. The Durango was towed from its location and processed by police. The window in the rear of the vehicle had been shattered, there was a hole in the front windshield, and there were three other bullet defects in the rear and passenger side of the vehicle.

{¶ 10} Deaver and Davis were both indicted on eight charges: felony murder, in violation of R.C. 2903.02(B); four counts of felonious assault, in violation of R.C. 2903.11(A)(2); one count of improperly discharging a firearm at or into a habitation, in violation of R.C. 2923.161; and two counts of discharge of a firearm on or near prohibited premises, in violation of R.C. 2921.162(A)(3), along with accompanying one- and three-year firearm specifications.

{¶ 11} Prior to trial, Deaver filed a notice of self-defense, as required by Crim.R. 12.2. In the filing, Deaver stated that a prior drive-by shooting of one of his

friends, combined with the Durango driving slowly past the home in a threatening manner, gave rise to his reasonable belief that they were in imminent danger of another shooting occurring.

{¶ 12} The matter proceeded to a joint jury trial. The State presented over 500 exhibits and 20 witnesses, including the police officers who responded to the shooting, the investigating detectives, and employees of the Cuyahoga County crime lab, including an expert in the field of firearms and toolmarks comparison and analysis. There was also testimony from attendees of the cookout, including T.C.'s nephew, M.M., along with three of the occupants of the Durango.

{¶ 13} The defense presented the testimony of Trevon Bland ("Bland"), the brother of Deaver and Davis, who was present at the cookout. Bland testified that he saw a dark SUV with heavily tinted windows slowly drive by the house in a "suspicious" and "frightening" manner. (Tr. 1028-1029.) He stated that everyone went inside because they were "scared, nervous." (Tr. 1029.)

{¶ 14} On cross-examination, Bland admitted that he did not see anyone actually shooting that day and had no idea where the shots went to or came from or even who was holding a gun. (Tr. 1047.) As he was in the doorway heading into the house, he heard a shot and a female voice yell, "They're shooting." (Tr. 1031.)

{¶ 15} Deaver testified on his own behalf, as did Davis. Deaver admitted that he had owned multiple firearms but stated that at that time he only owned a Glock .45-caliber handgun; this firearm was loaded and on his person in a holster at the cookout. (Tr. 1076.) With regard to the Durango, Deaver testified that it was

"driving slow," and someone appeared to be "scoping the scene of [the] house" out of the back window. (Tr. 1083.) He reacted to this by bringing the children closer in case something was going to happen — in particular, a drive-by shooting. (Tr. 1084-1085.) Deaver stated that he was especially concerned because his friend had recently been shot by someone in a vehicle that had been driving in the same way as the Durango. (Tr. 1085.) He said that "everybody" at the cookout was concerned about the Durango. (Tr. 1087.)

{¶ 16} Deaver testified that he did not see the Durango turn around and come back toward the house; the next time he saw the vehicle was when it was in front of the driveway, driving at "maybe two miles an hour." (Tr. 1087 and 1089.) A woman yelled "gun," and everyone began hurrying toward the house. (Tr. 1088 and 1092.) The children that had been playing in the front yard, including G.G., ran up the stairs to the residence. (Tr. 1088.)

{¶ 17} Deaver testified that "we" heard gunfire coming from the Durango, so he fired two shots toward the vehicle. (Tr. 1089.) He admitted that he did not see any of the occupants of the Durango and just heard the gunshots. (Tr. 1090.) Deaver stated that he knew the gunshots came from the Durango because there were "no fireworks going at the moment" and "[t]here was nobody else outside there." (Tr. 1092-1093.) He also explained that the gunshots were not fireworks because they were too loud. (Tr. 1093.) Deaver testified that Davis came out of the house after Deaver had fired his two shots, and Davis fired his own shots with his "AK" toward the Durango. (Tr. 1097 and 1098.)

{¶ 18} Deaver then saw that G.G. was lying face down on the porch, bleeding profusely. (Tr. 1094.) He loaded her into his father's vehicle, and his father started to drive them to the hospital. (Tr. 1096 and 1099.) Cleveland Police officers arrived just then, and they took G.G. to the hospital. (Tr. 1099.) Deaver drove in his own vehicle to the hospital. (Tr. 1100.)

{¶ 19} While he was at the hospital, Deaver spoke with Det. Dayton. (Tr. 1102.) He stated that the detective asked him if he knew anybody from the Durango, if he had seen the direction the vehicle went, and whether anyone else at the house had been shot. (*Id.*) Deaver testified that Det. Dayton asked if they fired back and stated it would be self-defense if they had. (*Id.*) Deaver informed the detective that his friend had been shot two weeks prior in a drive-by shooting; he explained that he told the detective because he initially thought the Durango was a part of that shooting as well. (Tr. 1102-1103.)

{¶ 20} Deaver testified that he did not tell Det. Dayton that he had fired his gun because he was overwhelmed with emotions at the time; he acknowledged that it was wrong not to tell the detective. (Tr. 1103.) On cross-examination, Deaver admitted that he had not ever contacted the police to let them know that he had not been truthful at the hospital. (Tr. 1115.) He stated that he had lost the detective's card and did not make any other attempts to get in touch with police. (Tr. 1115-1116.) Deaver testified that he did not know where his firearm went after the shooting, and he did not ask anyone that had been at the cookout if someone had picked up his gun. (Tr. 1109.)

{¶ 21} The prosecutor asked Deaver about his familiarity with the occupants of the Durango. He stated that he knew two of them but could not think of any reason why they would have shot at the cookout. (Tr. 1120-1121.)

{¶ 22} Davis also testified on his own behalf. Davis testified that he was in the house when he heard people "barging" into the door and screaming that "the Durango was about to shoot up the house." (Tr. 1136-1137.) He said that he saw G.G. get shot when she was running up the stairs to the house. (Tr. 1140.) He ran outside and saw Deaver firing at the Durango. (Tr. 1141.)

{¶ 23} Davis testified that he later learned who the individuals in the Durango were but that he had not seen any of them before. (Tr. 1143-1144.) He saw the vehicle stop and a door open; he began firing at the Durango. (Tr. 1145-1146.) Davis testified that he did not recall how many shots he fired but that he stopped when the car started to drive off. (Tr. 1146-1147.) He stated that Deaver had stopped firing by the time Davis started. (Tr. 1158.) He admitted that he did not see anybody from the Durango shoot. (Tr. 1155.) Davis acknowledged that when he was shooting there was no one in the Durango shooting at him but stated that he thought the Durango occupants were going to start firing on him. (Tr. 1158-1159.)

{¶ 24} Davis spoke to police at the hospital but was not honest with them about what had happened (Tr. 1150.) When asked why he lied, Davis testified that he was "experiencing a tragedy" and "was on probation" and "didn't want to say that [he] was there with a firearm." (*Id.*)

{¶ 25} Davis stated that he had known three of the four occupants of the Durango since high school; he could not recall how long he had known the fourth. (Tr. 1155-1156.) He could not think of any reason why the Durango occupants would have been shooting at the house. (Tr. 1156.)

{¶ 26} During the trial, Deaver requested certain jury instructions relating to his claim of self-defense. He submitted a memorandum of case law in support of the requested instructions. The court denied his request and stated that self-defense instructions from the Ohio Jury Instructions ("OJI") would be used.

{¶ 27} Following the close of the State's case-in-chief, Deaver moved for judgment of acquittal pursuant to Crim.R. 29. He argued that the State had not proven Counts 1 through 8 beyond a reasonable doubt. In particular, with regard to Count 7, he asserted that there was no evidence that anyone on the other side of the street was injured and therefore Deaver could not be guilty of discharging a firearm over a public highway, which caused serious physical harm to a person. The court denied the motion. Deaver renewed his motion following the close of all evidence, arguing in general as to all counts but in particular as to Count 6. He contended that to be convicted of discharge of a firearm into a habitation required some evidence demonstrating that Deaver did not have the privilege to do so. The motion for acquittal was again denied.

{¶ 28} The jury found both Deaver and Davis guilty on all counts. Both defendants were sentenced to an aggregate sentence of 25 years to life, with the sentences on Counts 1, 2, and 6 to be served consecutively to each other.

{¶ 29} Deaver then filed the instant appeal.[1]

## II. Law and Analysis

{¶ 30} For ease of discussion, we will address some of the assignments of error out of order.

## A. Prearrest Silence

{¶ 31} In his first assignment of error, Deaver argues that the trial court permitted the State to use his prearrest silence as evidence of his guilt during its case-in-chief. Specifically, he asserts that (1) the State presented testimony from Det. Dayton, and Detective Lisette Gonzalez ("Det. Gonzalez"), who investigated the shooting, and M.M. that commented on Deaver's prearrest silence; and (2) during the State's closing argument, the prosecutor referenced M.M.'s testimony that Deaver had told him the day after the shooting that he had shot at the Durango in self-defense. Deaver asserts that the State caused the jury to draw impermissible inferences of guilt from Det. Dayton's testimony that Deaver never told him that he was involved in the shooting when he was questioned at the hospital and from Det. Gonzalez's testimony that her investigation would have changed had she known that Deaver was involved in the shooting.

{¶ 32} Deaver argues that he had a right under the Fifth Amendment to not incriminate himself by admitting to police that he had previously given a false

---

[1] An appeal was also filed by Davis, Appeal No. 115459, which was treated as a companion appeal to this matter.

statement.  Deaver equates his failure to correct his statement to police with prearrest silence.  We find no merit to Deaver's arguments.

{¶ 33} The testimony Deaver states was improper occurred during the direct examination of Det. Dayton after the State played some of his bodycam video recorded at the hospital on the night of the shooting:

> PROSECUTOR: You gave Mr. Deaver your card.  Did he ever reach out to you again?
>
> DET. DAYTON: Not that I recall, no.
>
> PROSECUTOR: Did he ever claim that he saw someone shooting from the street or from a car?
>
> DET. DAYTON: He did not.
>
> PROSECUTOR: Did he ever acknowledge that he was shooting?
>
> DET. DAYTON: He did not.
>
> PROSECUTOR: That his brother was shooting?
>
> DET. DAYTON: He did not.
>
> PROSECUTOR: At the time that you spoke to each of these young men, Mr. Davis and Mr. Deaver, were they suspects at that time, or were they merely witnesses?
>
> DEAVER'S COUNSEL: Objection.
>
> THE COURT: Overruled.
>
> DET. DAYTON: I think that was yet to be determined.  I was gathering facts.

(Tr. 873-874.)

{¶ 34} Generally, a defendant's Fifth Amendment rights would be violated by allowing the State to use "pre-arrest silence in the state's case-in-chief [that] would force defendants either to permit the jury to infer guilt from their silence or surrender their right not to testify and take the stand to explain their prior silence." *State v. Leach*, 2004-Ohio-2147, ¶ 31 (8th Dist.). However, "prosecutors may use a defendant's pre-arrest silence as substantive evidence of his [or her] guilt if the defendant did not expressly invoke his [or her] right to remain silent." *Abby v. Howe*, 742 F.3d 221, 228 (6th Cir. 2014), citing *Salinas v. Texas*, 570 U.S. 178, 183 (2013). The *Salinas* Court reasoned that the privilege against self-incrimination "'generally is not self-executing'" and that a witness who desires its protection "'must claim it.'" *Id.* at 181, quoting *Minnesota v. Murphy*, 465 U.S. 420, 425, 427 (1984), quoting *United States v. Monia*, 317 U.S. 424, 427 (1943).

{¶ 35} The Court further explained that "forfeiture of the privilege against self-incrimination need not be knowing." *Id.* at 190. "Statements against interest are regularly admitted into evidence at criminal trials . . . and there is no good reason to approach a defendant's silence any differently." *Id.* Therefore, with certain exceptions not applicable in the case at hand, none of the protections guaranteed by the Fifth Amendment are available unless or until the defendant explicitly invokes the privilege. *Id. See also, e.g., State v. Register*, 2025-Ohio-106, ¶ 40 (8th Dist.) (finding no violation of privilege against self-incrimination where testimony presented that defendant volunteered, but failed, to bring police officers a written

statement and other evidence because testimony concerned defendant's action before "being accused or charged with a crime").

{¶ 36} There is no indication here that Deaver was asserting his right to remain silent when he did not contact police in the days between his shooting and his eventual arrest. During this time, Deaver was not charged with a crime or even accused of one.

{¶ 37} Moreover, a defendant's silence must be induced by governmental action. *See State v. Cannon,* 2014-Ohio-4801, ¶ 12 (8th Dist.); *Leach* at ¶ 22. Here, no governmental action induced Deaver to remain silent in the time between his interview at the hospital and his arrest nearly one month later. Deaver's failure to speak occurred before he was taken into custody and given Miranda warnings. He voluntarily spoke to the detective at the hospital and did not invoke his right to remain silent.

{¶ 38} Even if Deaver's failure to contact police to correct his statement did qualify as prearrest silence, the *Leach* Court recognized two exceptions for its use at trial: (1) as impeachment evidence, and (2) as evidence of the "course of the investigation." *Id.* at ¶ 21-22 and 32. The latter exception applies here. Deaver's interview at the hospital was captured on Det. Dayton's body camera. In the video, Det. Dayton asked Deaver, "Was there anybody at the house that was shooting?" (State's exhibit No. 523.) Deaver responded, "Oh, no, I can't tell you. I just hear gun shots and everybody's running." (*Id.*)

{¶ 39} The following exchange subsequently occurred:

DET. DAYTON: If – I want to be real clear about this, if somebody at your house was shooting at the car because they were in fear, that's something we need to know.

DEAVER: I can't say – they may have shot back. I don't know the direct details. I can't tell you, you know, the direct details.

(*Id.*) Det. Dayton also asked Deaver if he had seen anybody at the house with a gun. Deaver made a gesture seeming to convey that he had no recollection and responded that "it was black . . . it happened so fast." (*Id.*)

{¶ 40} The State's questions to Det. Dayton at trial established what information was known to police after the initial interviews at the hospital and thus reflected the course of the investigation. As Det. Dayton stated, at the time he spoke with Deaver at the hospital, he was "gathering facts" and that it was yet to be determined whether Deaver was a suspect or a witness. (Tr. 873-874.)

{¶ 41} The State's question to Det. Gonzalez was also not improper:

PROSECUTOR: If you had had information at the onset of your investigation that Mr. Davis and/or Mr. Deaver were shooting, would that have changed your investigation?

DET. GONZALEZ: It would have changed the steps of the investigation.

(Tr. 900-901.)

{¶ 42} The record reflects that the State was not eliciting testimony about Deaver's prearrest silence but instead asking Det. Gonzalez about the steps she took during her investigation. Det. Gonzalez testified that the information she had initially was that there had been a possible drive-by shooting. This court has held that similar testimony was legitimate evidence related to the course of the

investigation and did not violate the defendant's Fifth Amendment rights. *State v. Lucas*, 2020-Ohio-1602, ¶ 107 (8th Dist.); *State v. Collins*, 2020-Ohio-4136, ¶ 49 (8th Dist.) ("[T]he detective's statement during direct examination about being unable to schedule an interview with [the defendant] and his statement on cross-examination about attempting to speak with [the defendant] were admissible to explain the course of the investigation.").

{¶ 43} Finally, Deaver cites the testimony of M.M., who stated that Deaver had admitted to him the day after the shooting that Deaver had shot at the Durango to protect his family. The State referred to M.M.'s testimony in closing argument, noting that while Deaver had testified that he was too traumatized after the shooting to tell the police what had really happened, Deaver was not too traumatized to tell M.M.

{¶ 44} Again, there was no governmental action causing Deaver's silence. He had not been accused or charged with a crime at the time he spoke with M.M. and did not provide the same information to police. M.M.'s testimony did not violate Deaver's right against self-incrimination.

{¶ 45} Additionally, during his closing argument, Deaver's counsel was the first to refer to M.M.'s statement. He argued that Deaver had not waited until trial to assert that he was acting in self-defense; rather, Deaver provided that information to M.M. the day after the shooting. The State did not mention M.M.'s testimony until its final closing argument, which was *after* Deaver's closing argument.

{¶ 46} The trial court did not err in allowing the State's questions, and Deaver's first assignment of error is overruled.

### B. Limitations on Presenting Evidence and Cross-Examining Witnesses

{¶ 47} In his fourth assignment of error, Deaver argues that the trial court improperly limited his cross-examination of the investigating detective's determination of what constituted fireworks versus gunfire within the audio recording presented as State's exhibit No. 503. This exhibit was a surveillance video captured from a camera near the site of the shooting that had recorded a number of "bangs," including the shots fired by Deaver and Davis.

{¶ 48} During cross-examination, Det. Gonzalez indicated that it was possible that the initial sounds heard on the video were either fireworks or gunfire. Defense counsel then asked her, "So it's certainly possible that the people at [the cookout] that were firing a gun or guns . . . mistakenly believed that those were gunshots when, in fact, they were fireworks?" (Tr. 955.) Counsel for the State objected on the grounds of speculation, and the court sustained the objection. Deaver argues that the trial court abused its discretion in limiting his ability to cross-examine the detective as a lay witness who could form opinions regarding the audio in State's exhibit No. 503.

{¶ 49} Deaver was attempting to use the detective to demonstrate that other people would not be able to identify the sounds as fireworks or gunfire, which supported his argument of reasonableness. "Ohio law specifically precludes

questions that require a witness to speculate or guess about the thoughts of another." *State v. Blanton*, 2018-Ohio-1275, ¶ 21 (4th Dist.), citing *State v. Ross*, 1995 Ohio App. LEXIS 5743, *6 (7th Dist. Dec. 22, 1995); *see also State v. New*, 2006-Ohio-2965, ¶ 23 (10th Dist.) ("Witnesses cannot know what is in another person's mind. Therefore, witnesses cannot venture opinions on the [thoughts] of another person . . . . Witnesses may only testify to the facts they observed.").

{¶ 50} Deaver's question asked the detective to speculate about what the attendees of the cookout had potentially heard. He inquired whether it was "certainly possible" that the defendants "mistakenly believed" that fireworks were actually gunshots. He further asked Det. Gonzalez, "If you can't tell whether those were gunshots or fireworks, then would it stand to reason that [Deaver] wouldn't either?" (Tr. 955.) Any answer by the detective would have been inherently speculative, and the trial court properly sustained the objection. Deaver's fourth assignment of error is overruled.

### C. Jury Instructions

{¶ 51} In his second assignment of error, Deaver argues that the trial court improperly declined to instruct the jury on what constituted a reasonable belief for the use of deadly force and would only utilize OJI instructions. He also contends that he was denied instructions on the inferior offenses of aggravated assault and involuntary manslaughter as part of the felonious-assault and murder instructions.

{¶ 52} We review a trial court's refusal to give a particular jury instruction for an abuse of discretion. *State v. Daniel*, 2016-Ohio-5231, ¶ 30 (8th Dist.), citing *State*

*v. Leonard*, 2013-Ohio-1446, ¶ 33 (8th Dist.). An abuse of discretion occurs when a court exercises its judgment in an unwarranted way regarding a matter over which it has discretionary authority. *Johnson v. Abdullah*, 2021-Ohio-3304, ¶ 35.

{¶ 53} However, "a trial 'court does not have discretion to misapply the law.'" *Morgan v. Greater Cleveland Regional Transit Auth.*, 2025-Ohio-1655, ¶ 64 (8th Dist.), quoting *Johnson* at ¶ 38. "Thus, an abuse of discretion also occurs when a court '"applies the wrong legal standard, misapplies the correct legal standard, or relies on clearly erroneous findings of fact."'" *Id.*, quoting *Thomas v. Cleveland*, 2008-Ohio-1720, ¶ 15 (8th Dist.), quoting *Berger v. Mayfield*, 265 F.3d 399 (6th Cir. 2001).

{¶ 54} The Ohio Supreme Court has noted that "'while OJI is widely used in this state, its language should not be blindly applied in all cases.'" *State v. Sanchez-Sanchez*, 2022-Ohio-4080, ¶ 186 (8th Dist.), quoting *State v. Burchfield*, 66 Ohio St.3d 261, 263 (1993). "There are times they may be incomplete or even incorrect for a particular case." *State v. Thomas*, 2015-Ohio-2935, ¶ 78 (9th Dist.), citing *State v. Napier*, 105 Ohio App.3d 713 (1st Dist. 1995). A court may use the pattern jury instructions, but it must also tailor the instruction to accurately apply to the evidence presented at trial.

{¶ 55} A requested jury instruction should be given if it contains a correct statement of the law, is appropriate to the facts, and reasonable minds might reach the conclusion sought by the instruction. *Murphy v. Carrollton Mfg. Co.*, 61 Ohio St.3d 585, 591 (1991); *State v. Nelson*, 36 Ohio St.2d 79 (1973), paragraph one of the

syllabus. The trial court should not instruct the jury where there is no evidence to support the requested instruction. *State v. Williams*, 2011-Ohio-5385, ¶ 32 (8th Dist.), citing *Riley v. Cincinnati*, 46 Ohio St.2d 287 (1976).

## 1. Self-Defense

{¶ 56} The trial court instructed the jury, pursuant to OJI 421.21(E), that if the State proved that Deaver used unreasonable force, Deaver did not act in self-defense. Deaver argued that if deadly force was justified based upon the facts, then it was inappropriate to instruct on unreasonable force. He asserted that the issue of reasonableness is only relevant in nondeadly force cases. Deaver's counsel submitted a memorandum of law regarding the instructions and cited to a case from the Alaska Supreme Court in support of his argument, but the trial court declined to use instructions outside of OJI.

{¶ 57} In his brief, Deaver contends that the court should have deleted the "reasonableness" language because it does not apply to deadly force and it confused the jury into believing that Deaver was required to prove reasonableness when they only needed to determine whether Deaver was acting in self-defense by firing back at the Durango. However, beyond an Alaska Supreme Court case, which is not binding on this court, Deaver does not provide any authority upon which his theory is based. And this court has addressed this specific question, including the reference to the Alaska Supreme Court case, in *State v. Coates*, 2025-Ohio-5340 (8th Dist.). In *Coates*, we found that the court had instructed the jury in accordance with Ohio law on self-defense, including the "unreasonable force" jury instruction.

This "unreasonable force" jury instruction is found in OJI 421.21(E), which is titled "Self-defense, defense of residence — use of deadly force R.C. 2901.05." Furthermore, this court has stated that the "amount of force used in self-defense . . . must be reasonable . . . . Where one uses a greater degree of force than is necessary under all the circumstances, it is not justifiable on the grounds of self-defense . . . . The issue of whether a defendant used unreasonable force in repelling a perceived danger is a question of fact for the jury." *State v. Taslitz*, 2015-Ohio-3474, ¶ 20 (8th Dist.).

We find no abuse of discretion in the trial court's instructing the jury regarding unreasonable force. The jury instruction at issue is a correct statement of Ohio law and relevant to the facts adduced at Coates' trial.

*Id.* at ¶ 99.

{¶ 58} We find the same reasoning applies here. The court did not abuse its discretion by instructing the jury regarding unreasonable force and declining to use Deaver's proposed instructions. The instruction correctly stated Ohio law and applied to the facts presented at trial.

### 2. Aggravated Assault and Involuntary Manslaughter

{¶ 59} Deaver requested that the court instruct the jury on the inferior offenses of aggravated assault and involuntary manslaughter. The court declined to instruct on these offenses, finding that they were incompatible with a self-defense argument. In addition, the court noted that Deaver had not argued that there was any "sudden passion or rage" that would have warranted an instruction for aggravated assault.

{¶ 60} A trial court must charge on a lesser-included or inferior offense "where the evidence presented at trial would reasonably support both an acquittal on the crime charged and a conviction upon the lesser included or inferior offense."

*State v. Carter*, 2018-Ohio-3671, ¶ 59 (8th Dist.), citing *State v. Thomas*, 40 Ohio St.3d 213 (1988), paragraph two of the syllabus. In determining whether the instruction is warranted, the trial court views the evidence in the light most favorable to the defendant. *State v. Monroe*, 2005-Ohio-2282, ¶ 37. But the lesser-included or inferior-offense instruction is not warranted every time "some evidence" is presented to support the lesser offense. *State v. Shane*, 63 Ohio St.3d 630, 632 (1992). Rather, a court must find sufficient evidence to allow a jury to reasonably reject the greater offense and find the defendant guilty on the lesser-included or inferior offense. *Carter*, citing *Shane* at 632-633.

{¶ 61} Here, Deaver does not point to "some evidence" that would warrant an instruction on aggravated assault. Deaver did not testify that he was under such provocation that he could not control his actions, and there was no other evidence to support such an assertion. Regardless, this court has held that "self-defense does not apply to aggravated assault." *State v. Torres,* 2024-Ohio-837, ¶ 9 (8th Dist.), citing *State v. Hughkeith*, 2023-Ohio-1217, ¶ 102 (8th Dist.), citing *State v. Bouie*, 2019-Ohio-4579, ¶ 47 (8th Dist.), *State v. Betliskey*, 2015-Ohio-1821, ¶ 24 (8th Dist.), and *State v. Loyed*, 2004-Ohio-3961, ¶ 14 (8th Dist.).

{¶ 62} Deaver encourages us to disregard this line of cases and follow *State v. Hurt*, 2022-Ohio-2039 (8th Dist.), where this court held that the jury should have been instructed on both self-defense and aggravated assault as a lesser-included offense. However, in *Hurt*, the defendant was charged with both murder and voluntary manslaughter. The panel determined that the defendant could claim self-

defense in response to the murder charge and serious provocation to support the voluntary-manslaughter charge. Consequently, *Hurt* is factually unique and its application is limited; it has no bearing on the instant matter.

{¶ 63} Because Deaver solely argued that he acted in self-defense, the trial court properly declined to instruct on the inferior offense of aggravated assault. Without the predicate offense of aggravated assault, an involuntary-manslaughter instruction was also unwarranted.

{¶ 64} Deaver's second assignment of error is overruled.

### D. Sufficiency of the Evidence

{¶ 65} In his third assignment of error, Deaver argues that his convictions were not supported by sufficient evidence and that the court erred in denying his motion for acquittal under Crim.R. 29. Specifically, he contends that (1) the State failed to prove that he caused the death of G.G. as the proximate result of committing felonious assault, and (2) the State failed to present any evidence that he improperly discharged a firearm into a habitation "without privilege."

{¶ 66} Crim.R. 29(A) provides that a court "shall order the entry of a judgment of acquittal of one or more offenses . . . if the evidence is insufficient to sustain a conviction of such offense or offenses. . . ." A Crim.R. 29 motion questions the sufficiency of the evidence, and we apply the same standard of review to a trial court's ruling on a Crim.R. 29 motion as we do in reviewing challenges to the sufficiency of the evidence presented at trial. *Fairview Park v. Peah*, 2021-Ohio-2685, ¶ 37 (8th Dist.).

{¶ 67} "'[A]n appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed,' would convince the average mind of defendant's guilt beyond a reasonable doubt." *State v. McQuisition*, 2024-Ohio-3011, ¶ 25 (8th Dist.), quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991). "'The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *Id.*, quoting *id.* at paragraph two of the syllabus, citing *Jackson v. Virginia*, 443 U.S. 307 (1979). "'In essence, sufficiency is a test of adequacy. Whether the evidence is legally sufficient to sustain a verdict is a question of law.'" *Id.*, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997).

## 1. Felonious Assault

{¶ 68} Deaver argues that the State did not provide sufficient evidence to demonstrate that he caused the death of G.G. by committing felonious assault. Specifically, he argues that there were only two casings found at the scene that corresponded to the firearm that Deaver testified that he owned at the time. Because those two shots are accounted for, he asserts that the bullet that struck G.G. could not have come from his weapon. Deaver maintains that the "only logical conclusion" is that someone in the Durango fired the shot that struck G.G.

{¶ 69} There were no bullets or casings found in the street where the Durango had stopped or near the residence where the shooting occurred. (Tr. 898-

899.)  There were not any bullets or casings at the houses on either side of the cookout residence.  (Tr. 899-900.)  The only place that shell casings were located was at the cookout residence.  (Tr. 522.)

{¶ 70} In addition, T.C. testified that she did not see a gun sticking out of the Durango — only that it drove by suspiciously.  (Tr. 469-470.)  One of the occupants of the Durango testified that they had heard fireworks going off that evening.  (Tr. 585.)  She further testified that none of the Durango occupants had a gun.  (Tr. 583 and 585.)  Aside from Deaver's self-serving testimony, there was no evidence that anyone in the Durango was shooting.

{¶ 71} Furthermore, the State presented evidence that there were bullet fragments recovered from the same type of gun that Deaver owned, a .45-caliber handgun.  One bullet fragment was located in the house across the street where a bullet had gone through the front window of the house.  (State's exhibit Nos. 61-63, and 71-72; tr. 975-976.)  Two more bullet fragments were recovered from vehicles in the street.  (Tr. 973-976.)  The bullet that struck G.G. also exited her body, and it is unknown if any of the fragments located were from that bullet.  (Tr. 965.)

## 2. Improperly Discharging a Firearm

{¶ 72} Deaver contends that the State did not present any evidence that Deaver acted "without privilege" in order to convict him of improperly discharging a firearm at or into a habitation.  Deaver urges us to follow *State v. Bradley*, 2024-Ohio-5225 (7th Dist.), where the court of appeals found there had been insufficient

evidence presented to show that the defendant lacked privilege.[2]  The *Bradley* Court

explained, "[N]o one testified Appellant lacked privilege or permission to shoot at

this home.  There is no evidence in the record showing who the owner was, let alone

whether he/she granted Appellant permission to shoot at the house."  *Id*. at ¶ 82.

{¶ 73} The Second District addressed the same question and declined to

follow *Bradley*, holding:

> The overt conduct that is prohibited in R.C. 2923.161(A)(1) is knowingly discharging a firearm at or into an occupied structure that is a permanent or temporary habitation of any individual. The commission of this offense constitutes a felony offense of violence. R.C. 2901.01(A)(9)(a).  Discharging a firearm at an occupied structure inherently presents a serious risk of potential injury to others.  And the interest of a private person in the inviolability of their home is significant.  *State v. Steffen*, 31 Ohio St.3d 111, 115, 31 Ohio B. 273, 509 N.E.2d 383 (1987).  Common sense dictates that a person normally does not have a privilege to discharge a firearm at or into an occupied structure.  As the First District noted in [*State v.*] *Gordon* [9 Ohio App.3d 184 (1st Dist. 1983], a privilege includes a broad range of potential circumstances.  Requiring the State to prove that a defendant under any circumstance did not have a privilege to discharge a firearm at or into a habitation is an onerous burden which could not have been intended by the legislature.  Accordingly, the privilege in this context is "an excuse or justification peculiarly within the knowledge of the accused, on which the accused can fairly be required to adduce supporting evidence."  R.C. 2901.05(D)(1)(b).

*State v. Thompson-Rivers*, 2025-Ohio-5067, ¶ 60 (2d Dist.).

{¶ 74} The evidence presented in this matter showed bullet fragments in the

house and vehicles that were in the street.  Cleveland Police Detective Shane Bahouf

("Det. Bahouf") testified that he spoke with the owner of the house across the street,

---

[2] *Bradley* has been appealed to the Ohio Supreme Court, but the Court declined to consider the grounds at issue here.

B.B. He stated that B.B. allowed him inside to document the bullet that had entered the residence. The shooting was a spontaneous event where multiple shots were fired by the defendants. Based upon Deaver's testimony, the intended target of his shots was the occupants of the Durango; presumably the shots fired into B.B.'s house and the vehicles in the street were accidental. As in *Thompson-Rivers*, common sense dictates that Deaver did not have the privilege to discharge a firearm at or into B.B.'s home. *Id.*

{¶ 75} Viewing the evidence in a light most favorable to the State, we find that a rational trier of fact could have found the essential elements of felonious assault and improperly discharging a firearm into a habitation proven beyond a reasonable doubt. Deaver's convictions were supported by sufficient evidence, and his third assignment of error is overruled.

### E. Consecutive Sentences

{¶ 76} In his final assignment of error, Deaver argues that the trial court's imposition of consecutive sentences was not clearly and convincingly supported by the record.

{¶ 77} We review felony sentences under the standard set forth in R.C. 2953.08(G)(2); *see State v. Marcum*, 2016-Ohio-1002, ¶ 1, 16, 146 Ohio St. 3d 516. R.C. 2953.08(G)(2) provides that when reviewing felony sentences, a court may overturn the imposition of consecutive sentences only where the court "clearly and convincingly" finds that (1) "the record does not support the sentencing court's

findings under R.C. 2929.14(C)(4)," or (2) "the sentence is otherwise contrary to law." *State v. Jones*, 2024-Ohio-1083, ¶ 12.

{¶ 78} When imposing consecutive sentences, a trial court is required to make the findings mandated by R.C. 2929.14(C)(4) at the sentencing hearing and it must incorporate its findings into its sentencing entry. *State v. Bonnell*, 2014-Ohio-3177, ¶ 37. A trial court may order prison terms to be served consecutively if it finds that "the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public." R.C. 2929.14(C)(4). Further, the court must also find any of the following:

> (a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.
>
> (b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.
>
> (c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crimes by the offender.

R.C. 2929.14(C)(4)(a)-(c).

{¶ 79} R.C. 2953.08(F) requires an appellate court to review the entire trial-court record, including any oral or written statements made at the sentencing hearing, and any reports that were submitted to the court before the sentence was

imposed. *Jones* at ¶ 12. The trial court is not obligated to state reasons to support its findings, "[n]or is it required to give a talismanic incantation of the words of the statute, provided that the necessary findings can be found in the record and are incorporated into the sentencing entry." *Bonnell* at ¶ 37.

{¶ 80} At the sentencing hearing, the trial court stated as follows:

I'm going to note that the Court finds consecutive sentences are necessary to protect the public from future crime and to punish the offenders, and that the consecutive sentences are not disproportionate to the seriousness of the offenders' conduct and to the danger the offenders pose to the public.

I find, with regards specifically to Mr. Deaver, that at least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflect the seriousness of the offender's conduct . . . .

The reason I'm giving consecutive sentences, I'll note, is that there's three groups of victims here: There's [G.G.], the four individuals who were in the car, I believe the shooting at them deserves its own sentence, and the fact that you shot over a roadway on a busy and dense residential street resulting in one of those bullets striking through a home merits its own sentence as well.

(Tr. 1415-1417.)

{¶ 81} There is no dispute that the trial court made the proper statutory findings on the record. Deaver solely argues that the trial court's findings were not supported by the record. In particular, Deaver notes his minimal criminal history and claims that the trial court had a "personal agitation" against him because the court was "bothered" by Deaver's characterization of his neighborhood as far more dangerous than the court believed. Deaver also notes that the court imposed the

minimum sentences on each count to run consecutively rather than imposing the maximum sentence of each count to run concurrently.

{¶ 82} We find no merit to Deaver's argument regarding the court's "personal agitation" toward him as exemplified by the judge's disapproval of Deaver's characterization of his neighborhood and his reference to his own experiences. As the Ohio Supreme Court explained in *State v. Arnett*, 88 Ohio St.3d 208 (2000), a trial judge is not required "to divorce [himself or herself] from all personal experiences" in determining an appropriate sentence for an offense:

> [T]he individual decisionmaker has the discretion to determine the weight to assign a particular statutory factor. *State v. Fox*, 69 Ohio St.3d 183, 193, 1994 Ohio 513, 631 N.E.2d 124 (1994), citing *State v. Mills*, 62 Ohio St.3d 357, 376, 582 N.E.2d 972 (1992). A discretionary decision necessitates the exercise of personal judgment, and we have determined that when making such judgments, the sentencing court "is not required to divorce itself from all personal experiences and make [its] decision in a vacuum." *State v. Cook*, 65 Ohio St.3d 516, 529, 605 N.E.2d 70 (1992), citing *Barclay v. Florida*, 463 U.S. 939, 103 S.Ct. 3418, 77 L.Ed.2d 1134 (1983).

*Arnett* at 215-216 (finding that trial judge's reference to a biblical verse when sentencing defendant "constituted a permissible exercise of her discretion"); *see also State v. Caraballo*, 2012-Ohio-5725, ¶ 43 (8th Dist.) (finding no error where trial judge, in explaining her reasoning in deciding appropriate sentences to impose, referenced the fact that the victim's age was approximately her own and that this fact made her much more aware of the seriousness of the defendant's crimes).

{¶ 83} Most importantly, Deaver's "minimal" criminal history did not render the imposition of consecutive sentences improper in this case. This court has

previously held that "'even where a defendant has *no* criminal history, consecutive sentences may be imposed if the court makes one of the alternative findings under R.C. 2929.14(C)(4)(a) or (b).'" (Emphasis added.) *State v. Franklin*, 2019-Ohio-3759, ¶ 18 (8th Dist.), quoting *State v. Nave*, 2019-Ohio-348, ¶ 7 (8th Dist.) Here, the court found that R.C. 2929.14(C)(4)(b) applied, stating that at least two of the multiple offenses were committed as part of one or more courses of conduct and that the harm caused by two or more of the multiple offenses committed was so great or unusual that no single prison term would adequately reflect the seriousness of Deaver's conduct. We cannot find that the record clearly and convincingly did not support this finding, particularly given the circumstances of the shooting.

{¶ 84} Finally, Deaver has pointed to no authority requiring the trial court to impose maximum sentences concurrently rather than minimum sentences consecutively. "[T]he trial court has 'full discretion to impose a prison sentence within the statutory range' and is not required to make findings or give its reasoning for imposing maximum sentence.'" *State v. Thomas*, 2019-Ohio-538, ¶ 15 (8th Dist.), quoting *State v. Foster*, 2006-Ohio-856, paragraph seven of the syllabus.

{¶ 85} Deaver's fifth assignment of error is overruled.

{¶ 86} The judgment of the trial court is affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's

conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN T. GALLAGHER, PRESIDING JUDGE

SEAN C. GALLAGHER, J., and
ANITA LASTER MAYS, J., CONCUR